UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
                                    )
UNITED STATES OF AMERICA,           )
                                    )
        v.                          )    Criminal Action No. 03-348   RWR)
                                    )
JACK DAVIS,                         )
                                    )
        Defendant.                  )
                                    )
```

## MEMORANDUM OPINION AND ORDER

On November 1, 2004, Jack Davis was convicted after jury trial of a narcotics conspiracy,, possession of marijuana, possession with intent to distribute phencyclidine ("PCP" firearm possession during a drug trafficking offense, and unlawful distribution of cocaine.[1] Davis moved for judgme t of acquittal, challenging the sufficiency of evidence and th propriety of pretrial rulings allowing the admission of c rtain evidence. He also moved for a new trial alleging a viola ion of

---

[1] The superseding indictment on which the defendant as tried charged six offenses: conspiracy between 1993 and 2 )3 to possess with intent to distribute cocaine, crack cocaine, PCP, and marijuana, in violation of 21 U.S.C. § 846 (Count One possession of marijuana, in violation of 21 U.S.C. § 844( (Count Two); possession with intent to distribute PCP, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) (Count T ee); using, carrying, and possessing a firearm during a drug trafficking offense, in violation of 18 U.S.C. § 924 (c)( (Count Four); unlawful possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. § 92 (k) (Count Five); and unlawful distribution of cocaine, 21 U. C. § 841(a)(1) and (b)(1)(C) (Count 6). The defendant was a quitted of Count Five.

- 2 -

the Jencks Act, 18 U.S.C. § 3500 (2000), and for a court order permitting him to interview the jurors.*

The defendant's motion for judgment of acquittal will be denied. The evidence when viewed in the light most favorable to the government permitted a reasonable jury to find the essential elements, of a conspiracy to distribute PCP', and the government was not required to establish that the charged conspiracy existed during the exact dates mentioned in the indictment. An FBI agent's trial testimony was not significantly inconsistent with his testimony at the pretrial suppression hearing or with another agent's trial testimony, and neither an order vacating the denial of the pre-trial suppression motion nor a judgment of acquittal is warranted. Moreover, the government properly introduced the defendant's acquitted conduct as evidence of conduct in furtherance of the conspiracy and not as character evidence.

No willful or negligent Jencks violation that warrants a new trial has been established. Because no judicial inquiry is permitted into the jury's deliberative process, and because the defendant has failed to show good cause or reasonable grounds for interviewing jury members, the defendant's motion to interview the jurors will be denied.

---

<sup>2</sup>   Although the docket indicates that the defendant's motion was filed on November 12, 2004, a date-stamped copy of his originallmotion shows that it was filed on November 10, 2004, within the seven-day time period allowed under Federal Rules of Criminal Procedure 33(b)(2) and 45(a).

- 3 -

BACKGROUND

**Davis** was driving a Lincoln Navigator on December 17, 2001. FBI Special Agents Kyle Fulmer and Robert Lockhart stopped Davis for failing to come to a complete stop at a stop sign. (Mot. Tr. 3/18/04 at 34, 38-45.)   The agents searched the Navigator and found in it marijuana, PCP, and a weapon.   Before trial, Davis moved to suppress the evidence recovered during the traffic stop, alleging that the stop was illegal and that the fruits of the resulting search and seizure should be suppressed.   (Mot. Tr. 3/18/04 at 166.)   The court credited Fulmer's testimony that **Davis'** vehicle failed to come to a full stop at a stop sign, found that the agents had conducted a lawful traffic stop, and denied the defendant's motion.   (Mot. Tr.  3/18/04 at 173-4.)   At trial, when Fulmer was questioned about the traffic stop, Fulmer first stated that the defendant stopped his vehicle before trying to make a U-turn.   When asked to clarify, Fulmer explained that he called a rolling stop a stop, even though it is not a full stop.   Fulmer maintained that because the defendant came to only a rolling stop and not a full stop, the defendant had committed a traffic violation.   (Trial Tr. 10/21/04 a.m. at 114-16.)

Before trial, Davis also filed a motion in limine seeking to restrict the introduction of any evidence implicating him in the murder of David Scott on the ground that Davis had been acquitted of that murder charge.   (Corrected Mot. in Limine [#180].)   The

- 4 -

conspiracy count alleged that in furtherance of the conspiracy, Davis and his co-conspirators used firearms and committed acts of violence, including murder, against anyone who disrupted or threatened to disrupt the conspiracy or in retaliation for violence committed against members of the conspiracy.   The motion in liming was denied on the ground that the murder evidence was intertwined with, and direct evidence of, the crimes being charged.

At trial, the government called as witnesses Fulmer, Lockhart, former FBI police officer Warren Hills, and a number of the defendant's alleged co-conspirators and cooperating witnesses including Michael Henderson, Rodney Robertson, Robert Crawford, Paul Tyler, Thomas Davis, Keith Harrison, Marcus Robertson and Cedric Conner.   The testimony revealed that Thomas Davis introduced the defendant to a woman known as "Pinky," that the defendant stored PCP and Thomas **Davis** stored crack cocaine in Pinky's house, that both **Davises** sold these drugs from there, and that the defendant supplied Pinky with "dippers" of PCP.   Trial Tr. 10/19/04 p.m. at 101-05; Trial Tr. 10/20/04 a.m. at 9. Pinky was a willing participant in this arrangement.   (Trial Tr. 10/19/04 p.m. at 104.)   During an interval from 1993 to 1996, the defendant and his twin brother James Davis were also involved in

- 5 -

selling marijuana with Keith Harrison.[3]   (Trial Tr. 10/13/04 a.m. at 78.)   During roughly the same time, the defendant agreed to supply Thomas Davis with drugs to sell (Trial Tr. 10/19/04 p.m. at 78, 94-96), the defendant sold Thomas Davis'cocaine (Trial Tr. 10/19/04 p.m. at 104; Trial Tr. 10/20/04 a.m. at 63-65), and the defendant and his brother James sold either marijuana or crack cocaine.: (Trial Tr. 10/20/04 a.m. at 81-85.)

Henderson testified that the defendant shot and killed a man known as "Head."   (Trial Tr. 10/7/04 p.m. at 13-15.)   Harrison said the murder occurred in 1996.   (Trial Tr. 10/13/04 a.m. at 83.)   Henderson and Thomas Davis testified that Head was killed because Head robbed the defendant's brother James nd the defendant wanted revenge.   (Trial Tr. 10/7/04 p.m. at 13-15; Trial Tr. 10/19/04 p.m. at 86-87.)   Thomas Davis and Richardson said that the defendant was acquitted of Head's murder.   (Trial Tr. 10/19/04 p.m. at 86-87; Trial Tr. 10/21/04 a.m. at 66.)

Hills testified that the defendant visited the FBI field office on December 18, 2001 and asked for the return of the vehicle,, earrings and belt that the agents had confiscated upon

---

[3]   The defendant suggests that Keith Harrison contradicted this testimony by later testifying that "he did not start dealing with [the defendant and James Davis] until late 2000, early 2001, which was his FIRST time dealing with [them]."   (Def.'s Reply to Gov.'s Combined Opp'n to Def.'s Omnibus Mot. for J. of Acquittal, for New Trial, and for Ct. Order Permitting Def. to Interview Jurors ("Def.'s Reply") at 2.)   That latter testimony, however, referred to his cocaine, and not marijuana, transactions.   (Trial Tr. 10/13/04 p.m. at 49-50.)

- 6 -

his arrest after being stopped for making a U-turn.   (Trial Tr.
10/18/04 p.m. at 24-25, 29, 33.)   Hills said the defendant
mentioned owning a gun.   (Id. at 25, 36-38.) However, Hills
denied two details Fulmer apparently wrote in his summary of his
interview of Hills, namely, that the defendant described the U-
turn as "illegal" and the agents had taken a gun from the
vehicle. (Id. at 36-38.)   Hills mentioned that he had prepared a
handwritten statement detailing the defendant's visit to the FBI
office and had given the statement to an agent whom Hills could
not identify by name.   (Trial Tr. 10/18/04 p.m. at 34.)   In a
bench conference, defense counsel sought production of a copy of
Hills's written statement, and stated that the Assistant United
States Attorney ("AUSA") did not recall having received a copy.
(Id. at 36.)   In confirming that, the AUSA stated that he would
try to determine if such a statement existed, and if so, would
make Hills available for further cross-examination.   (Id. at 36.)

     During the deliberations, the jury sent out a note
"request[ing] a definition of the common terms for
weight/quantities of powdered and crack cocaine, PCP, marijuana."
(Trial Tr. 10/27/04 a.m. at 14-15.)   The court's written response
read: "Dear jurors, I 'am not certain that I know exactly what you
are asking for.   May I ask you to give me a bit more detail in
your question so that I may try to answer you."   (Trial Tr.
10/27/04 a.m. at 18-19.)   The jury responded the following:

morning with another note stating that they "would like weights
in grams of street terms such as 62s, 31s, eightballs, dime bags,
quarters, etcetera, as a definition of these terms in grams."
(Trial Tr. 10/28/04 a.m. at 2-3.)   The court's written response
was:   "Dear jurors, Thank you for clarifying yesterday's question
concerning definitions of weights . . . .   You must rely entirely
upon your memory of the testimony and other evidence, and your
notes if you took any, concerning definitions of weights."   (<u>Id.</u>
at 4-5.)  Both parties agreed that this answer was satisfactory.
(<u>Id.</u> at 5.)   The jury later sent out a note asking whether it
must find all elements of Count Five before it could find the
defendant; guilty on that count.   (<u>See</u> Trial Tr. 11/1/04 p.m.
at 5.)   Defense counsel argued that the court should respond that
finding all elements on *all* counts was necessary.   The court
instead responded that to convict on Count Five, the jury must
find all elements of that count, but noted the defendant'
objection.   (Trial Tr. 11/1/04 p.m. at 23.)

     The defendant filed an omnibus post-trial motion.   He seeks
a judgment of acquittal arguing that the government presented
insufficient evidence to establish a conspiracy during the times
alleged, and arguing that the court should reconsider and reverse
its rulings denying the suppression motion and allowing the
government to present evidence of the defendant's acquitted
conduct.  He also seeks a new trial, claiming that the government

- 8 -

failed to provide Hills's Jencks statement.  The defendant also
asks for a court order permitting him to interview the jurors to
determine whether the jurors relied on extra-record data and
whether the jurors found all elements of all the counts before
finding the defendant guilty.  (Def.'s Am. Omnibus Mot. for J. of
Acquittal, Mot. for New Trial, Mot. for Ct. Order and
Incorporated Mem. of Law in Supp.  ("Def.'s Am. Mot.") at 1, 8-
14.)

## DISCUSSION

I.   MOTION FOR JUDGMENT OF ACQUITTAL

Under Rule 29(c) of the Federal Rules of Criminal Procedure,
a defendant may renew a motion for judgment of acquittal after a
guilty verdict has been returned.  Fed. R. Crim. P. 29(c)    A
judgment of acquittal is warranted "only when there is no
evidence upon which, a reasonable mind might find guilt beyond a
reasonable doubt."  <u>United States v. Hernandez</u>, 780 F.2d 13, 120
(D.C. Cir. 1986).  The court "must view the evidence in the light
most favorable to the verdict, and must presume that the jury has
properly carried out its functions of evaluating the credibility
of witnesses, finding the facts, and drawing justifiable
inferences."  <u>United States v. Campbell</u>, 702 F.2d 262, 264 (D.C.
Cir. 1983).

- 9 -

A.    Narcotics conspiracy

The defendant argues that the evidence at trial was insufficient to convict him for conspiracy to possess with intent to distribute cocaine, crack, PCP, and marijuana between 1993 and 2003. (Def.'s Am. Mot. at 8.) Specifically, the defendant contends that (1) the government presented no evidence of a conspiracy to distribute PCP between 1993 and 2003, and (2) the evidence did not suggest any drug activity between the defendant and the witnesses from 1993 to 1998. (Id. at 8-9.)

    1.    Conspiracy to distribute PCP

To establish a conspiracy in violation of § 846, the government must show an agreement or mutual understanding between at least two people to violate narcotics laws, and knowing and intentional participation in the conspiracy. See United States v. Hines, 398 F.3d 713, 718 (6th Cir. 2005), cert. denied sub nom. Edwards v. United States, 125 S. Ct. 2592 (2005).

The government's evidence was that Thomas Davis used Pinky's Fourth Street apartment to store and sell crack cocaine. Thomas Davis introduced the defendant to Pinky, and Pinky allowe the defendant to store his PCP in her apartment and sell PCP to others from her apartment in-exchange for PCP. When viewed in the light most favorable to the verdict, this evidence alone was sufficient for a jury to conclude that the defendant was involved in an ongoing conspiracy to distribute PCP.

- 10 -

2.    Evidence of a conspiracy between 1993 and $998

The government is not required to prove, that a conspiracy began and ended on the exact, dates mentioned in the indictment. <u>United States v. Queen</u>, 132 F.3d 991, 999 (4th Cir. 1997); <u>United States v. Heimann</u>, 705 F.2d 662, 666 (2d Cir. 1983) ("Particularly with respect to allegations of time, [the court has] permitted proof to vary from the indictment provided that the proof fell within the period charged."); <u>United States[4] v. Postma</u>, 242 F.2d 488, 497 (2d Cir. 1957) (finding that even though the proof at trial showed a conspiracy starting only in 1952 when the indictment alleged that it began in 1951, "it does not follow that there was a fatal variance [because] the conspiracy proved fell within the period charged"); <u>see also United States v. Valencia</u>, 226 F. Supp. 2d 503, 508n.3 (S.D.N.Y. 2002) (" [A]ll the Government need do is prove that the conspiracy fell within the period charged.").   "[T]he trier of fact may find that the starting date of a conspiracy begins anytime in the time window  alleged so long as the time frame alleged places the defendant sufficiently on notice of the acts with which he is charged."  <u>Queen</u>, 132 F.3d at 999 (holding that "the specificity of the indictment's allegations" sufficiently put the defendant on notice of the charged crime and "the date of the conspiracy was not a substantive element of the crime of conspiracy"). Because the indictment charged a conspiracy between 1993 and 2003

(Def.' s Am. Mot. at 9), and since the government needed to prove only that the conspiracy occurred within the time window alleged, a lack of evidence of a narcotics conspiracy between 1993 and 1998 is not a ground for judgment of acquittal.  Heimann, 705 F.2d at 666.

In any event, the government's evidence showed that the defendant sold marijuana from 1993 to 1996 with James Davis and Keith Harrison.  Government witnesses also revealed that during this time, the defendant conspired with Thomas Davis to sell drugs, sold Thomas Davis cocaine, and sold either marijuana or crack cocaine with James Davis.  The government did produce evidence that a conspiracy existed during the time frame alleged.

B.   Narcotics and gun convictions

The defendant argues that the evidence was insufficient to convict him of Counts Two through Four and Count Six alleging possession of marijuana; possession with intent to distribute PC?; using, carrying, and possessing a firearm during a drug trafficking offense; and unlawful distribution of cocaine, respectively.  (See Def.'s Am. Mot. at 9.) Specifically, he contends that the court should reverse its prior denial of his motion to suppress, and that suppression of the evidence would warrant a judgment of acquittal on those counts.  He bases his request for reversal on claimed differences between Fulmer's testimony at the suppression hearing and his testimony at trial,

- 12 -

and between Fulmer's and Lockhart's testimony at trial.[4]   (Id. at 9.)   The defendant cites no authority for the proposition that a post-conviction judgment of acquittal would be the proper remedy should a court reconsider the denial of a motion to suppress1 evidence.   The defendant's argument appears to be more properly the subject of either a motion for reconsideraticnI of the motion to suppress or of a motion for a new trial.   See United States v. Broomfield, 201 F.3d 1270, 1273 (10th Cir 2000) (affirming the district court's order that denied defendant's motion to suppress seized evidence, and denying defendant's request for a new trial without the seized evidence); Rouse v. United States, 359 F.2d 1014, 1016 (D.C. Cir. 1966) (remanding for fresh determination of the suppression motion and stating that a new trial would be ordered if suppression was granted). But see United States v. Jennings, 235 F. Supp. 551, 552-E14 (D.D.C. 1964) (denying the defendant's motion for judgment of acquittal based on illegally seized evidence because the court found that the Commissioner had a substantial basis for issuing a search warrant).

A p&-trial ruling on a motion to suppress does not bind the trial judge in all circumstances.   Rouse v. United States, 359

---

[4]   Counts Two, Three, and Four stemmed from the traffic stop of the defendant by Fulmer and Lockhart on December 17, 2001. The defendant does not present any basis for suppressing the evidence'related to the cocaine distribution on November 22, 2002 charged in Count Six.

- 13 -

F.2d 1014, **1015-16 (D.C.** Cir. 1966). When new facts shed new
light on the credibility of government witnesses and reasonable
doubt is cast on the pre-trial decision, it then becomes the duty
of the trial judge to reconsider the issue of suppression de
novo. Id. at 1016. Where major inconsistencies in the police
testimony surface both at the suppression hearing and at trial,
the trial court should conduct a "fresh determination of the
suppression issue." Id.; see Jackson v. United States, 353 F.2d
**862,** 867 (D.C. Cir. 1965) (holding that where an officer's
testimony is internally contradictory and is "contrary to the
human experience," that officer's testimony can be discredited
and the suppression decision reversed).

In Rouse, the suppression hearing testimony of two police
officers who arrested the defendant was inconsistent. **3 95** F.2d
at 1015. The police officers disagreed as to who was driving the
police cruiser when the defendant was found, how far away the
defendant was when they spotted him (one stated that he was "just
a short distance" away from R street, while the other stated that
the defendant was not anywhere near R street), and in which
direction the officers followed the defendant. Id. The judge
denied the motion to suppress, but expressed concern regarding
the numerous inconsistencies that he stated were not slight or
immaterial, and reserved the appellant's right to renew the
motion at trial. Id. At trial, one of the officers changed his

- 14 -

testimony significantly to correspond almost identically with the other officer's testimony. <u>Seed</u> . When the officer was questioned about the inconsistencies between his testimony at the suppression hearing and at trial, the officer stated that he had confused the facts of the defendant's case with those in another case. <u>Id.</u> When the defendant moved again for the material to be suppressed, the trial judge credited the suppression judge's decision and denied the motion to reconsider. <u>Id.</u> On appeal, the D.C. Circuit found that the officer's explanation for the inconsistency in his testimony "stirred previous doubts and raised new ones" and "reasonably required inquiry and a fresh determination of the suppression issue." <u>Id.</u> at 1016 (remanding the case for fresh determination of the suppression issue, and stating that if suppression was granted, a new trial would be ordered). <u>Id.</u> at 1016.

Where testimonial inconsistencies are minor, however, the district court has discretion to suppress based on its "unique position to gauge [the witness's] credibility" when observing the demeanor of the witness. <u>United States v. Valentine</u>, 401 F.3d 609, 614 (5th Cir. 2005). Testimony is not always suspiciously inconsistent when the differences are insignificant. <u>See United States v Fryer</u>, 974 F.2d 813, 818 (7th Cir. 1992) (finding **that** the officer's testimony was not significantly inconsistent when he first testified that he stopped the defendant for turning

- 15 -

right at an intersection where that is not allowed, and ater
that he stopped the defendant for turning right without first
stopping) .

Here, Fulmer's trial testimony is not significantly
inconsistent with his testimony at the suppression hearing. At
the suppression hearing, Fulmer testified that the defendant did
not come to a full stop at the stop sign. (Mot. Tr. at 39.) At
trial, although Fulmer stated that the defendant stopped before
making the U-turn, he qualified that statement by explaining that
he refers to a "rolling stop" as a stop, but that the defendant
did not come to a full stop. (Trial Tr. 10/21/04 a.m. at 117.)
Fulmer never testified at either the trial or the suppression
hearing that the defendant came to a complete stop at the stop
sign. This inconsistency was only a minor one. Sede: ntine,
401 F.3d at 612; Fryer, 974 F.2d at 818-19; cf. Rouse, 359 F.2d
at     101finding multiple inconsistencies between the two police
officers' testimonies at the suppression hearing, as well as
between the suppression hearing and trial).

The defendant also alleges that Lockhart's testimony was
inconsistent with Fulmer's testimony because at trial, Lockhart
testified that the decision to stop the defendant was made after
the defendant failed to stop at a stop sign, made an illegal U-
turn, and almost collided with their unmarked police vehicle.
(Trial Tr. 10/18/04 a.m. at 49.) Both Lockhart and Fulmer

justified pulling over the defendant's vehicle based in part on the defendant's failure to stop at a stop sign.  (<u>Id.</u>) Lockhart's rendition of events would not have changed the court's pretrial disposition of the suppression motion.   Thus, no reconsideration of the motion to suppress is warranted.

    c. | <u>Government's use of acquitted conduct</u>

    Finally, the defendant seeks reversal of the denial of the defendant's motion in limine regarding the defendant's acquitted conduct. (Def.'s Am. Mot. at 14.)   The defendant appears to be arguing that although the court admitted as being intrinsic to the crimes charged here evidence of the murder of which defendant was acquitted, its admission "substantially prejudice[d] the defendant in the eyes of the jury." (<u>Id.</u>) The defendant also claims that the government is now trying to justify admission of this evidence under Federal Rule of Evidence 404(b)[5], which would have required giving the jury a cautionary instruction about the limited role that this evidence should play.[6] (Def.'s Am.

---

    [5] Rule 404(b) states in part that "[e]vidence of other crimes . . . is not admissible to prove the character of a person in order to show action in conformity therewith.   It may, however, be admissible for other [proper] purposes[.]" Fed. R. Evid. 404(b).

    [6] The defendant's argument that the government has "changed its position" is unpersuasive.   (Def. 's Am. Supplemental Argument at 2.)   The government's opposition does not reflect a change in position.   The government argues that the murder evidence "was direct evidence of allegations contained in the indictment," where "Rule 404(b) does not apply." (Gov.'s Combined Opp'n at 11.)   Although the government later states that proof of

- 17 -

Supplemental Argument at 1-2.)   Although it is unclear from his

post-trial briefs, it seems that the defendant is also arguing

that no evidence indicates that the alleged conspiracy and the

murder were related.'   (Def.'s Am. Mot. at 2.)

Where the government offers evidence of an incident that is

part of the conspiracy alleged in the indictment, it is not an

"other crime" which would be subject to Rule 404(b) and require a

cautionary jury instruction.   United States v. Badru, 97 F.3d

1471, 1474 (D.C. Cir. 1996); United States v. Gray, 292 F. Supp.

2d 71, 79 (D.D.C. 2003).   Rather, "[t]he evidence is offered as

direct evidence of the fact in issue, not as circumstantial

evidence requiring an inference as to the character of the

accused.'   Badru, 97 F.3d at 1475 (citing 22 Wright & Graham,

Fed. Practice and Procedure § 5329 at 450 (1978)).   Evidence is

intrinsic to the crime charged in the indictment if "it is an

motive, intent, identity, plan and absence of mistake "are [also]
completely proper under Rule 404(b)" (id.), this is not an
indication that the government is now justifying the admission of
this evidence through Rule 404(b).   Instead, the government is
merely articulating that if an act is part of the crime charged,
"evidence of it will, by definition, always satisfy Rule 404(b)."
United States v. Alexander, 331 F.3d 116, 126 n.13 (D.C. Cir.
2003); see also United States v. Bowie, 232 F.3d 923, 927 (D.C.
Cir. 2000).

     [7]   The defendant avers that "at no time during the murder
trial of Jack Davis did the government indicate that Jack Davis
shot David Scott because he robbed Jack or James Davis of his
drug money. . . . Nor was it ever indicated during the murder
trial that Jack and James Davis were drug dealers . . . or in a
conspiracy to sell drugs."   (Id. at 2.)

- 18 -

uncharged offense which arose out of the same transaction or
series of transactions as the charged offense [or] if it was
inextricably intertwined with the evidence regarding the charged
offense.:'   Id. at 1474 (quoting <u>United States v. Weeks</u>, 736 F.2d
830, 832 (11th Cir. 1983)).

Here, witnesses testified that the defendant shot and killed
Head in 1996 because Head robbed the defendant's brother, a co-
conspirator.   Count One of the indictment in this case alleged
that the defendant committed acts of violence and murder iI
furtherance of the 1993 to 2003 narcotics conspiracy charged and
in retaliation for violence committed against members of the
conspiracy.   As such, the defendant's alleged murder of Head was
part of the crime charged and was fairly subject to proof.   This
intrinsic evidence was not governed by Rule 404(b) and its
probative value was not substantially outweighed'by the danger of
unfair prejudice.   The ruling on the motion in limine will not be
reversed and the defendant's motion for a judgment of acquittal
will be denied.

II.   MOTION FOR A NEW TRIAL

If a motion for a new trial is timely filed, it is within
the trial court's sound discretion to determine whether a new
trial is warranted.   <u>United States v. Walker</u>, 899 F. Supp 14, 15
(D.D.C. 1995).   A court may "grant a new trial if the interest of
justice so requires."   Fed. R. Crim. P. 33(a); <u>In re Unitt</u> d

- 19 -

states, 598 F.2d 233, 236 (D.C. Cir. 1979).  For a verdict to be
set aside, the moving party must show that an error has occurred,
that the error "was substantial, not harmless, and that the error
affected the defendant's substantial rights."  Walker, 899 F.
Supp. at 15 (internal quotation marks omitted).

The defendant argues that the court should grant a new trial
based on an alleged Jencks violation by the government.  Davis
claims that the government violated the Jencks Act when it failed
to produce Hills's written statement describing the defendant's
attempt to retrieve his belongings at the FBI.  (Def.'s Am. Mot.
at 6.)

The Jencks Act provides that in criminal prosecutions
brought by the United States, no statement or report in the
possession of the United States that was made by a government
witness is available to the defense until after the witness has
testified on direct examination in the trial.  18 U.S.C.
§ 3500(a).  After such a witness testifies, the defendant may
demand that the government produce the statement for the defense.
18 U.S.C. § 3500(b).  When the government "elects" not to provide
the requested material, the court "shall strike from the record
the testimony of the witness, and the trial shall proceed unless
the court in its discretion shall determine that the interests of
justice require that a mistrial be declared."  18 U.S.C.
§ 3500(d).  However, the "Jencks Act is not a mandate compelling

the trial judge to strike (or bar) a witness' testimony when a previousfy made statement, irrespective of the reason, cannot be produced by the Government." United States v. Perry, 471 F.2d 1057,1063 (D.C. Cir. 1972). The Jencks Act merely requires the trial judge to ensure that the "defendant has access to previous statements of a witness to the fullest extent possible . . . to further the interests of justice in the search for "truth.' Id. The Act on its own does not reflect any constitutio al requirement, United States v. Augenblick, 393 U.S. 548, 3 6 (1969), and sanctions under the Act are not automatic. See United States v. Rippy, 606 F.2d 1150, 1154 (D.C. Cir. 1979).

Generally, the Jencks Act suggests striking testimony when the previous statement by the witness was "lost or destroyed, negligently or for an unjustified purpose." Perry, 471 F.2d at 1063. When assessing whether testimony should have been stricken at trial, "the trial court is required to 'weigh the degree of negligence or bad faith involved, the importance of the evidence lost, and the evidence of guilt adduced at trial, in order to come to a determination that will serve the ends of justice. " Rippy, 606 F.2d at 1154 (citing United States v. Bryant, 39 F.2d 642, **653 (D.C.** Cir. 1971)). When there is no showing 3hat the government acted in bad faith in its failure to produce requested Jencks material, sanctions are not necessary. Perry, 471 F.2d at 1059-60.

For example, in <u>Perry,</u> the government provided all Jencks Act material to the defense counsel except for the grand jury testimony from one witness.  <u>Id.</u> at 1059.  The stenographic notes of the witness's testimony had been lost in the stenographer's office, and the government was unable to produce a transcript of the witness's testimony.  Id. at 1060, 1063.  The court interpreted both the words and the intent of the Jencks statute to hold that because there had "been no showing that the Government ha[d] done . . . any act which ha[d] resulted in its inability to comply with an order of the court to produce the grand jury testimony[,]. . . . there [was]. . . no basis under the statute for the application of the sanctions therein prescribed."  Id. at 1063-64.

Here, Hills testified that he gave to an agent he could not identify by name a statement Hills had handwritten detailing the events concerning the defendant's visit to the FBI's office.  At the bench conference after Hills mentioned the statement, the lawyers for both sides said they were unaware that this written statement existed.  The government promised to inquire as to whether a statement did exist, and if it did, to ensure that Hills would be made available for further cross-examination.  However, the government asserts that when it questioned its agents about this purported statement, none of the agents remembered receiving a statement from Hills.  (Gov.'s Am.

- 22 -

Combined Opp'n to Def. 's Omnibus Mot. ("Gov.'s Am. Opp'n") at 9.)
The government asserts that it conveyed this information to the
defendant, id., which the defendant denies.   (Def. 's Am. Resp.
at 7.)

The Jencks Act pertains to documents containing statements
of government witnesses that are in the possession of the United
States.  Here, the government claimed that the prosecutors, and
their agents never received a written statement from Hills.
Moreover, the defendant did not raise any further objection at
trial or move to have Hills's testimony stricken from the record.
Id.; see United States v. McKenzie, 768 F.2d 602, 607-08 (5th
Cir. 1985) (holding that because the defendants did not renew
their request for the alleged Jencks material after having
requested it prior to the trial, the defendants effectively
abandoned any claim to the material).   Although the government's
claim that it does not have Hills's previous statement is not
dispositive, McKenzie, 768 F.2d at 607, the defense has proffered
no other evidence suggesting that the government did, in fact, at
the time of the trial possess a statement to produce.

Even assuming a Jencks violation occurred, a new trial is
not an automatic remedy.   See United States v. Thomas, 97 F.3d
1499, 1502 (D.C. Cir. 1996) (stating that "there is no fixed rule
regarding what must be done if the government violates the
[Jencks] Act").   Instead, "[t]he administration of the Jencks Act

is 'within the good sense and experience of the district judge
. . . subject to the appropriately limited review by appellate
courts.'? Id. (quoting Palermo v. United States, 360 U.S. 343,
353 (1959)).

Here, no evidence suggests that the government willfully
destroyed any statement Hills wrote, or that the government
actually possessed one at the time of trial and negligently
displaced it or failed to produce it.  The government appears to
have made a good faith effort to comply with the defendant's
request by searching for the statement.

The defendant has not shown that not having any prior
statement written by Hills summarizing the defendant's comments
about the gun and the U-turn was of any moment.  The government
justified the traffic stop based upon agents' observations; it
offered no testimony that the defendant admitted to an illegal U-
turn.  The court's pretrial finding that the traffic stop was
lawful would have been unaffected by any Jencks material or
Hills.  Moreover, Hills told the jury that the defendant had not
asked for a gun back and had not claimed that the agents had
confiscated one.  This testimony helped distance the defendant
from a knowing possession of the gun seized.  Hills gave no
testimony about a gun seizure or U-turn unfavorable to the
defendant that was fit to impeach.  Production of any prior
statement might have helped discredit aspects of Fulmer's report

- 24 -

of his interview of Hills, but that report was not evidenc and subject to impeachment anyway.  The defendant has not esta lished that production of the statement would have been of anythi g other than tangential importance, particularly in the face of the substantial evidence of the defendant's guilt presented at the trial through the testimony of multiple cooperating witnes es and law enforcement officers.  Thus, a new trial is not warrar ed.

III. MOTION TO INTERVIEW THE JURORS

The defendant asks for permission to interview the ju ors,[8] or for the court to make its own inquiry, to "discern whet .er the jurors relied on out-of-court sources to determine the mea ing of certain terms that it requested clarification on, but more importantly, whether the jury found all of the elements or *all* of the counts before finding the defendant guilty of those cc nts." (Def.'s  . Mot. at 11.)

A.  Finding all elements of all counts

The defendant argues that when the jury sent a note question ng whether it had to find all elements to convict the defendan I of Count Five, the court should have answered th t finding all elements on all counts was necessary.  Because the court did not do so, the defendant claims that the jury mu st have

_____

[8]  Local Criminal Rule 24.2 prohibits parties from sp aking with jurors after a verdict has been rendered "except wher permitted by the court for good cause shown in writing."  CrR 24.2(b).

- 25 -

concluded that with regard to Counts One through Four and Six that it was not necessary to find all of the elements in order to convict. (<u>See</u> Def.'s Am. Mot. at 12-13.)   The defendant asks to interview the jurors to determine whether that is, in fact, what the jury concluded during their deliberations. (<u>Id.</u>)

Whether the jury followed the court's instructions is not subject to inquiry by the defendant. <u>United States v. Logan</u>, 250 F.3d 350, 380 (6th Cir. 2001). Although a jury has a certain "obligation to follow the law as it is given by the trial court, . . . it is a peculiar facet of the jury institution that once a verdict is rendered, no judicial inquiry is permitted into the jury's deliberative process to determine if in fact the court's instructions were properly followed." <u>United States v. D'Angelo</u>, 598 F.2d 1002, 1004 (5th Cir. 1979); <u>see also Sparf v. United States</u>, 156 U.S. 51, 80 (1895) ("The law authorized [the jury] to adjudicate definitively on the evidence; the law presumes that they acted upon correct rules of law given them by the judge . . . [and] [t]he verdict therefore stands conclusive and unquestionable."). Allegations of "'inside' influences on the jury - - such as pressure among jurors, misunderstanding of instructions, a compromise verdict, or a self-imposed time limit" do not entitle a convicted defendant to question the jurors or trigger a hearing requiring jurors to testify about their verdict. <u>United States v. Edelin</u>, 283 F. Supp. 2d 8, 13 (D.D.C.

- 26 -

2003)(citing <u>Logan</u>, 250 F.3d at 381).   Federal Rule of Evidence 606(b)[9] even bars a juror from testifying on most matters relating to deliberations and the verdict, Fed. R. Evid. 606(b); <u>Edelin</u>, 283 F. Supp. 2d at 13, to prevent the harassment of jurors by the defeated party and to ensure that what is intended to be a private deliberation can remain out of public scrutiny. See <u>McDonald v. Pless</u>, 238 U.S. 264, 267-68 (1915).

While the law does not sanction the inquiry sought, the facts here do not warrant one either.   The court instructed the jury multiple times in the final instructions regarding the necessity of finding all elements of a count before convicting the defendant of that count.   (<u>See, e.g.</u>, Trial Tr. 10/25/04 p.m. at 8, 19-22, 30-33, 35-36.)   The defendant did not object to the jury instructions when read to the jury in court.   (Trial Tr. 10/25/04 p.m. at 39.)   In fact, the defense "thought the court was very clear when it instructed the jury that the government had the burden of proving each element of each count."   (Trial

---

[9]   Federal Rule of Evidence 606(b) states in relevant part:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations . . . except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.

Fed. R. Evid. 606(b).

- 27 -

Tr. 11/1/04 p.m. at 8.)  Thus, there is no basis in law or fact to interview the jurors as to whether they found all elements of all counts.

    B.    <u>Extraneous sources</u>

    The defendant argues that because the court instructed the deliberating jurors to rely upon their own memories of the evidence when they asked to be told what the weights were of certain street terms for drug quantities, "it would have been impossible for the jury to have defined the terms for themselves without relying on out-of-court sources."  (Def.'s Am. Mot. at 12.)  The defendant asks to interview the jurors to determine whether they did, in fact, rely on outside sources to define the weights of the drugs. (Id.)

    Where a defendant seeks a post-conviction jury inquiry, there should be "reasonable grounds for investigation." <u>United States v. Moon</u>, 718 F.2d 1210, 1234 (2d Cir. 1983).  Reasonable grounds exist "when there is clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant." <u>Id.</u> (internal citations omitted); <u>United States v. Connolly</u>, 341 F.3d 16, 34 (1st Cir. 2003) (finding that the defendant did not meet the "high standard" to show that an impropriety occurred where,' after the trial ended, a newspaper reported that some jurors took notes *at night* despite the judge's

request that they refrain from taking notes *at trial*); United
States v. Rigsby, 45 F.3d 120, 124-25 (6th Cir. 1995) (stating
that a court investigation is appropriate when there is a
"credible allegation of extraneous influences" but not when the
defense counsel alleges juror bias for the first time after trial
when the juror knew some of the witnesses and had divulged this
information in court to no objection from the parties).

As an initial matter, the defendant did not object to the
instruction.   (Trial Tr. 10/28/04 a.m. at 5.)   Indeed, both the
defense and the prosecution agreed with giving the response to
the jury's question that was given.   (Trial Tr. 10/27/04 a.m.
at 15, 17.)   In any event, the defendant only speculates, but
presents no evidence, that the jury brought in extraneous
prejudicial information to define the drug weights.   Speculation
cannot trigger a jury inquiry.

Furthermore, although the court did not provide the
definitions of the weights for the jury, multiple witnesses
testified regarding the drug amounts and the terms used to
describe their weights.   Conner testified regarding the
difference between an ounce and a "31."   (Trial Tr. 10/6/04 p.m.
at 62.)   Henderson testified that an "eight ball" equals three-
and-one-half grams of cocaine (Trial Tr. 10/7/04 a.m. at 138),
and that a "62" is two-and-one-half ounces of cocaine powder.
(Trial Tr. 10/7/04 a.m. at 143.)   Henderson also detailed various

- 29 -

other drug transactions made by the defendant and the
corresponding weigh-ts of the drugs.   (Trial Tr. 10/7/04 p.m
at 23-26, 30-35, 40, 45-48.)   Harrison testified that a "31" is
thirty-one grams of crack cocaine, and that it can be split into
nine eight balls.   (Trial Tr. 10/13/04 a.m. at 89-90.) Harrison
also described how much he generally bought from the defendant
and James Davis.   (Trial Tr. 10/13/04 a.m. at 101-04.) Robertson
testified that an eighth of a kilogram equals four-and-one-half
ounces.   (Trial Tr. 10/19/04 a.m. at 46.)   Thomas **Davis**
reiterated that a "31" is 31 grams, and that it is half o:f a
"62."   (Trial Tr. 10/19/04 p.m. at 95.)   Richardson testified
that there are 125 grams of cocaine powder in an eighth o:f a
kilogram, fourteen grams in a half-ounce of crack cocaine, three-
and-one-half grams of crack cocaine in an eight ball, and 250
grams of cocaine powder in a quarter-kilogram.   (Trial Tr.
10/20/04 p.m. at 83-90.)   Richardson also testified as to the
difference between a "31" and an ounce.   (Trial Tr. 10/21/04 a.m.
at 22.)

      The testimony of these witnesses was sufficient for th.e jury
to determine drug weights.   The jury needed no out-of-court
sources to do so.   The defendant's request for permission to
interview the jurors, or for the court to conduct its own
inquiry, will be denied.

- 30 -

## CONCLUSION AND ORDER

The evidence, viewed in the light most favorable to

government, permitted a reasonable jury to find the essen

elements of a conspiracy to distribute PCP, and the gover

was not required to establish that the charged conspiracy

during the exact dates mentioned in the indictment.    Ther

significant inconsistency in the FBI agents' testimony wi

regard to the defendant's traffic stop which would warran

reversal of the court's denial of the defendant's pre-tri

motion to suppress.    The government properly introduced t

defendant's acquitted conduct as evidence of conduct intr

the conspiracy.    No willful or negligent Jencks violation

warranting post-trial relief has been shown.    The parties

inquire into the jurors' deliberative process, and the de

has not shown good cause or a reasonable basis for inquir

about possible extraneous influences on the jury's delibe

Therefore, it is hereby

ORDERED that the defendant's motion for judgment of

acquittal, for a new trial, and for a court order permitt

defendant to interview jurors [#243] be, and hereby is, D

It is further

ORDERED that the defendant's motion for a ruling [#2

and hereby is, GRANTED.    It is further

- 31 -

ORDERED that the defendant's sentencing be, and hereby is,

scheduled for January 4, 2006, at 3:30 p.m.

SIGNED this **22ⁿᵈ** day of **November**, 2005.

_____
RICHARD W. ROBERTS
United States District Judge